**UNITED STATES of America, Plaintiff,**

v.

**Russell Martin BLISS, et al.,
Defendants.**

**No. 84–200C(1).**

United States District Court,
E.D. Missouri, E.D.

Nov. 1, 1985.

Jill Newman and Joseph Moore, Asst. U.S. Attys., St. Louis, Mo., F. Henry Habicht, II, Steven R. Baer, John R. Barker, Mark E. Grummer, Brian G. Donohue, U.S. Dept. of Justice, Washington, D.C., James J. Kohanek, U.S. Environmental Prot. Agency, Washington, D.C., Cheryle Micinski, Asst. Regional Counsel, U.S. Environmental Prot. Agency, Kansas City, Kan., for plaintiff.

Eric B. Rothenberg, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for Saddle & Spur Club, Inc.

John J. Cole, St. Louis, Mo., Joseph M. Spivey, III, Richmond, Va., for all Syntex Cos.

F. Wm. McCalpin, Richard A. Ahrens, Lewis & Rice, St. Louis, Mo., for defendant Ind. Petro. Corp.

Ted L. Perryman, St. Louis, Mo., for defendants N.E. Pharm. & Chem. Co., Edwin Michaels and John Lee.

Russell & Evelyn Bliss, pro se.

Jerry R. Bliss, pro se.

## MEMORANDUM

NANGLE, Chief Judge.

This case is now before this Court on defendants' motion to dismiss for lack of jurisdiction over the person. In this action, the United States sues for both injunctive relief and for recovery of clean-up costs under §§ 106 and 107 of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C.

§§ 9606 and 9607, and § 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, in connection with six sites within the Eastern District of Missouri. As the United States alleges, these sites are contaminated by the hazardous substances 2, 3, 7, 8—tetracheorodibenzo-p-dioxin (Dioxin) and trichlorophenol (TCP) and threaten public health and the environment.

The United States alleges that between December, 1969 and January, 1972, the Syntex defendants along with defendants North Eastern Pharmaceutical and Chemical Company, Inc. (NEPACCO), Edwin Michaels and John Lee engaged in a joint venture to manufacture hexachlorophene, whose by-products include dioxin and TCP. NEPACCO used the facilities of Hoffman-Taff, Inc., a Missouri corporation. As the Government further alleges, defendants arranged for the transportation and disposal of these by-products to the various sites in Missouri which constitute the bases of this litigation. For an extensive discussion of the manufacturing activities of NEPACCO, *see United States v. Northeastern Pharmaceutical and Chemical Company, Inc.,* 579 F.Supp. 823 (W.D.Mo.1984).

Defendants Syntex Corporation (Syntex), Syntex Laboratories, Inc. (New Labs) and Syntex (U.S.A.), Inc. (Syntex (U.S.A.)), all members of the Syntex corporate family, move pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss plaintiff's second amended complaint. Defendants allege they lack the requisite contacts with this forum, are not currently doing business in Missouri, and are not subject to service of process under federal statute. The United States argues that jurisdiction is proper under the Missouri long-arm and general service statutes and under nationwide service of process authorized by CERCLA.

## I. SERVICE UNDER MISSOURI STATUTE

Rule 4(f) provides in pertinent part:

All process other than a subpoena may be served anywhere within the territorial limits of the state in which the district court is held, and, when authorized by a statute of the United States or by these rules, beyond the territorial limits of that state.

Assuming that federal law does not provide a method of service under CERCLA, defendants must be served "under the circumstances and in the manner" prescribed by Missouri law. *Fed.R.Civ.P.* 4(e); *see, DeMelo v. Toche, Inc.,* 711 F.2d 1260, 1266 (5th Cir.1983); *see also,* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1075 (1969). Defendants are foreign corporations. Syntex is a corporation organized under the laws of Panama. Syntex (U.S.A.) and Syntex Laboratories are Delaware corporations. Missouri law provides for service upon foreign corporations under its long-arm and general service statutes. As the United States alleges, the Syntex defendants were properly served under either statute.

### A. Missouri's Long-Arm Statute

In passing on a motion to dismiss for lack of jurisdiction over a non-resident, this Court must engage in a two-step inquiry: first, whether defendant committed one of the acts enumerated in the long-arm statute; and second, whether the exercise of personal jurisdiction over defendant violates the due process clause of the fourteenth amendment. *The Land-O-Nod Company v. Bassett Furniture Industries, Inc.,* 708 F.2d 1338 (8th Cir.1983); *Scullin Steel Co. v. National Railway Utilization Corp.,* 676 F.2d 309, 312 (8th Cir.1982). Plaintiff, the party that is seeking to invoke federal jurisdiction, has the burden of establishing that jurisdiction exists, and this burden may not be shifted to the party challenging the jurisdiction. *Mountaire Feeds, Inc. v. Agro Impex, S.A.,* 677 F.2d 651, 653 (8th Cir.1982). While the facts are viewed in the light most favorable to the plaintiffs, "there must nonetheless be some evidence upon which a prima facie showing of jurisdiction may be found to exist ...." *Aaron Ferer & Sons Co. v. Diversified Metals Corp.,* 564 F.2d 1211, 1215 (8th Cir.1977) (citations omitted). *See also, Data Disc, Inc. v. Systems Tech-*

*nology Associates, Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977) (plaintiff need only make a prima facie showing of jurisdictional facts through submission of affidavits plus discovery materials); *Greycas, Inc. v. Anderson,* 584 F.Supp. 894, 895–96 (E.D. Mo.1984); 4 Wright & Miller, *Federal Practice and Procedure: Civil* § 1068 at 250 (1969).

Missouri's Long-Arm statute provides: 1. Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any such acts:

   (1) The transaction of any business within this state;

   (2) The making of any contract within this state;

   (3) The commission of a tortious act within this state;

   (4) The ownership, use, or possession of any real estate situated in this state;

   (5) The contracting to insure any person, property or risk located within this state at the time of contracting.

   (6) Engaging in an act of sexual intercourse within this state with the mother of a child on or near the probable period of conception of that child.

2. ....

3. Only causes of action arising from acts enumerated in this section may be asserted against a defendant in an action in which jurisdiction over him is based upon this section.

Mo.Rev.Stat. § 506.500 (Supp.1984).

The due process clause of the fourteenth amendment places limits upon the power of a court to exercise personal jurisdiction over a non-resident defendant. The due process clause requires that a defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Land-O-Nod,* 708 F.2d at 1340. *Accord World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Kulko v. California Superior Court,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978). "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones,* 465 U.S. 783, 788, 104 S.Ct. 1482, 1486, 79 L.Ed.2d 804 (1984) (citations omitted). *See also Helicopteros Nacionales de Colombia S.A. v. Hall,* 466 U.S. 408, 413, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). The defendant's contacts with the forum state must be purposeful and such that defendant "should reasonably anticipate being haled into court there." *World Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. at 567. *See also Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958).

In this circuit, the due process standard has devolved into a consideration of five factors:

   (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

*Aaron Ferer & Sons Co. v. Diversified Metals Corp.,* 564 F.2d 1211, 1215 (8th Cir. 1977). *See Land-O-Nod,* 708 F.2d at 1340. The first three factors are of primary importance and the last two are of secondary importance. *Id.*

The United States predicates jurisdiction upon three theories. First, the Government asserts jurisdiction over the Syntex defendants through the activities of their wholly-owned subsidiary, Syntex Agribusiness. Second, the United States asserts jurisdiction over those Syntex defendants which succeeded to the liabilities of Hoffman-Taff, Inc. (Hoffman-Taff), a Missouri

corporation. Third, the United States contends that Syntex employees negotiated a joint venture agreement with NEPACCO, that the Syntex defendants arranged for the disposal of dioxin in Missouri, and that these contacts placed them under the ambit of the long-arm statute.

■■■■ Under its first theory, the Government predicates jurisdiction over the Syntex defendants upon their control of Syntex Agribusiness, which has not contested jurisdiction. If a subsidiary's presence in the state is primarily to carry on its own business and the subsidiary has preserved some semblance of independence from the parent, jurisdiction over the parent may not be acquired on the basis of the local activities. *See,* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1069 (1969). There is a presumption of corporate separateness that must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary. *Escude Cruz v. Ortho Pharmaceutical Corp.,* 619 F.2d 902, 905 (1st Cir.1980). The test is whether the parent so dominates and controls the subsidiary that the companies lose their separate identities. *See,* 2 *Moore's Federal Practice* ¶ 4.25(6) (1984). A court may not exercise jurisdiction solely because a parent owns all the stock of its subsidiary. 619 F.2d at 905. *Cannon Manufacturing Company v. Cudahy Packing Company,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), sets the standard by which this Court must determine jurisdiction. In *Cannon,* the Supreme Court refused to exercise jurisdiction over a parent through its ownership of a subsidiary:

> Through ownership of the entire capital stock and otherwise, the [parent] dominates [its subsidiary], immediately and completely; and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or department of its business not separately incorporated which are established to market the [parent's] products in other States. The existence of the [subsidiary] company as a distinct corporate entity is, however, in all respects observed. Its books are kept separate. All transactions between the two corporations are represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations.

267 U.S. at 335, 45 S.Ct. at 250. At least, plaintiff must demonstrate that defendants did not maintain corporate formalities.

Other courts have posed the issue in slightly different terms. In *Thunderbird Motor Freight Lines v. Consolidated Pipe & Supply,* No. 83–1791 (E.D.Mo. October 24, 1983) (memorandum and order granting motion to dismiss), Judge Regan granted a nonresident parent corporation's motion to dismiss for lack of personal jurisdiction. The Court focused on the lack of control over the day-to-day operations of the subsidiary:

> Admittedly, the [resident subsidiary] is wholly owned by [the nonresident parent. The subsidiary's] president is also chairman of [the parent's board] .... It is evidence that ... by virtue of its ownership, [the parent] has the right to elect the officers and directors of [the subsidiary]. However, they are separate and distinct corporate entities under the facts of record. There is no factual basis for finding that the corporate separation was fictional or other than real.
>
> The mere fact, if so, that the two corporations may have interlocking officers and directors does not demonstrate that [the parent] controls, dictates or actively participates in the day-to-day management and business operations of its subsidiary so as to make [the subsidiary] the agent or alter ego of [the parent].

Memorandum Opinion at 3–4.

■■■ In this case, the United States has submitted voluminous materials intended to demonstrate the domination of Syntex Agribusiness by the Syntex defendants. The Government sets forth the following facts as evidence of domination: Syntex Corporation altered the corporate structure of Hoffman-Taff and changed the name of

that corporation to Syntex Agribusiness; shared common officers and directors with Syntex Agribusiness; guaranteed bank loans for Syntex Agribusiness; required Syntex Agribusiness to report its activities on standardized forms; and manipulated cash flows through a cash management system. None of these facts indicates that the relationship between Syntex Corporation and Syntex Agribusiness is other than a usual parent-subsidiary relationship. Sole ownership gives Syntex Corporation substantial control over Agribusiness. Moreover, Syntex Corporation has chosen to assert its control. However, Syntex Corporation has not ignored corporate separateness. The two corporations maintain the formalities required of independent corporations. Syntex Corporation does not delve into the day-to-day operations of Agribusiness. Thus, this Court will not, to speak metaphorically, pierce the corporate veil to exercise jurisdiction over Syntex Corporation under the Missouri long-arm statute. This decision is consistent with the decision of Judge Filippine in *Wehner v. Syntex Agribusiness, Inc.*, 618 F.Supp. 37 (E.D.Mo.1985) (refusing to ignore corporate separateness to exercise jurisdiction over Syntex Corporation).

Similarly, the Government asserts jurisdiction over New Labs and Syntex (U.S.A.) upon the same theory of corporate control. Applying the above rationale, this Court finds the Missouri long-arm statute does not provide this Court with jurisdiction over either of these defendants.

■ Under its second theory, the Government asserts jurisdiction over the Syntex defendants as successors to NEPACCO's lessor, Hoffman-Taff, Inc. Generally, where one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except where the purchaser expressly or impliedly agrees to assume such debts, where the transaction amounts to a consolidation or merger of the corporation, where the

purchasing corporation is merely a continuation of the selling corporation, or where the transaction is entered into fraudulently to escape liability for such debts. *Brockmann v. O'Neill*, 565 S.W.2d 796, 798 (Mo. Ct.App.1978); *see*, Annot., 49 A.L.R.3d 881 (1973). At present, Syntex Corporation owns Syntex (U.S.A.) which in turn owns Syntex Agribusiness and New Labs. The current Syntex corporate structure results from a general reorganization during the early 1970's. Prior to reorganization, Hoffman-Taff joined the Syntex family. The Government contends that Hoffman-Taff was acquired by Old Labs; that Old Labs assumed the liabilities of Hoffman-Taff in that transaction; that as a result of the general reorganization, New Labs succeeded to the interests of Hoffman-Taff; and that, subsequently, these assets were passed to Syntex (U.S.A.) and reorganized as Syntex Agribusiness. Defendants trace their corporate history somewhat differently. They contend that Old Labs never succeeded to the assets and liabilities of Hoffman-Taff; that Old Labs assigned its interest in the sales agreement with Hoffman-Taff to Syntex Agribusiness; and that the assets and liabilities of Hoffman-Taff never passed through New Labs. Whichever corporate history one adopts, it is clear that the former assets of Hoffman-Taff now rest with Syntex Agribusiness, a wholly owned subsidiary of Syntex (U.S.A.). This Court must determine which, if any, of the Syntex defendants succeeded to the liabilities of Hoffman-Taff.

Two aspects of this series of transactions generate confusion. First, Old Labs acquired Hoffman-Taff indirectly through a series of shell corporations. This Court resolves the resulting ambiguity in favor of the United States. Essentially, Old Labs transferred the stock of Syntex Corporation to shareholders of Hoffman-Taff and, in return, received control of the assets of Hoffman-Taff. Thus, Old Labs succeeded to the liabilities of Hoffman-Taff. Second, in 1972 Syntex (U.S.A.) and Syntex Laboratories exchanged names, necessitating the

designation Old Labs and New Labs.[1] The United States argues that New Labs did not transfer the assets and liabilities of Hoffman-Taff in the 1972 transaction, but transferred them at some later unspecified date. Defendants maintain that Syntex (U.S.A.) and Old Labs merely exchanged names—that is, Old Labs in its entirety became Syntex (U.S.A.). With regard to this second area of confusion, this is not the first court to address the issue.

In *State of Missouri v. Independent Petro Chemical Corporation,* 610 F.Supp. 4 (E.D.Mo.,1985), Judge Filippine adopted defendants' characterization of the 1972 transaction and refused to exercise jurisdiction over New Labs in other litigation arising out of the manufacturing activities of NEPACCO. The arguments of the United States in this litigation do not convince this Court to hold otherwise. Consequently, this Court finds New Labs beyond the reach of Missouri's long-arm statute. However, regarding Syntex (U.S.A.), the United States has made a prima facie showing of jurisdiction. As successor to Old Labs and the liabilities of Hoffman-Taff, Syntex (U.S.A.) is subject to jurisdiction under the long-arm statute.[2]

Regarding its third theory, the United States alleges certain contacts between the Syntex defendants and this forum. The United States alleges that a Syntex employee, James Rattray, negotiated the joint venture agreement with NEPACCO which led to the eventual production of dioxin waste. During 1968 and 1969, representatives of NEPACCO sought facilities for the manufacture of hexacholorphene. Their search brought them to the Verona, Missouri facility owned by Hoffman-Taff, Inc. During this same period, Syntex began a series of corporate acquisitions which would result in the ownership of Hoffman-Taff, Inc. by the Syntex conglomerate. Rattray, an employee of Old Labs, participated in the negotiations between Hoffman-Taff and NEPACCO. On the basis of Rattray's participation, the Government urges this Court to exercise jurisdiction over the Syntex defendants.

Rattray's participation adds nothing to the Government's argument for exercising jurisdiction over Syntex Corporation. Rattray was employed by Old Labs, not Syntex Corporation. Whether his activities constitute a basis for the exercise of jurisdiction over Syntex Corporation turns upon Corporation's control over Old Labs, an argument rejected above. With regard to Syntex (U.S.A.), their employee may have negotiated a joint venture agreement which ultimately resulted in the disposal of hazardous waste in Missouri. However, since this Court exercises jurisdiction over Syntex (U.S.A.) as a successor to Hoffman-Taff and Old Labs, it need not pass upon the significance of Rattray's negotiations. Since this Court has chosen not to consider New Labs as a successor to Old Labs, Rattray's activities do not bear upon jurisdiction over New Labs.

As the Government further alleges, this Court may exercise jurisdiction over the Syntex defendants, because they arranged for the disposal of hazardous wastes through NEPACCO. NEPACCO purchased from Hoffman-Taff four insulated tanks used for the storage of PCP or Agent Orange, a defoliant containing dioxin. When sold to NEPACCO, two of these tanks contained waste products. As the Government alleges, at the time of the sale Hoffman-Taff was operated by James Rattray. One could conclude from this sale that Hoffman-Taff generated some of the waste disposed of by NEPACCO. Undoubtedly, this aspect of the sale interests the Government, because it would establish a second source of hazardous waste and a second basis for liability. However, with regard to personal jurisdiction, the Govern-

---

1. This is not the first litigation in which the 1972 transaction has generated confusion. *See, Skidmore v. Syntex Laboratories, Inc.,* 529 F.2d 1244 (5th Cir.1976) (plaintiff sued New Labs believing it to be Old Labs).

2. To establish jurisdiction the United States need only make a prima facie showing. Accordingly, this Court reaches no decision as to the ultimate liability of Syntex (U.S.A.).

ment's argument turns once again upon which corporation succeeded to the liabilities of Hoffman-Taff. When viewed from this perspective, it becomes apparent that only Syntex (U.S.A.) is subject to jurisdiction under the long-arm statute.

Having rejected jurisdiction over Syntex Labs and Syntex Corporation under the Missouri long-arm statute, this Court need perform a due process analysis only as to Syntex (U.S.A.). In this regard, the United States has made a prima facie showing that Syntex (U.S.A.) voluntarily assumed the liabilities of Hoffman-Taff. Given this finding, this Court has a little difficulty in deciding that defendant's contacts were purposeful and that defendant could reasonably anticipate being haled into Court here. *See, Worldwide Volkswagon*, 444 U.S. at 297, 100 S.Ct. at 567.

**B. Missouri's General Service Statute**

■ Under Missouri's general service statute, Mo.Rev.Stat. § 506.150(3) (1984), a foreign corporation may be served with process if it is "doing business" within the state. *Wooldridge v. Beech Aircraft Corporation*, 479 F.Supp. 1041, 1045 (W.D.Mo. 1979). As the United States alleges, first, New Labs is currently doing business within the state and, second, by virtue of the control exercised over Syntex Agribusiness by Syntex Corporation, Syntex Corporation is doing business for purposes of the Missouri statute.

At present, Syntex Laboratories maintains a staff of up to 14 sales representatives in Missouri. These sales representatives undertake typical promotional activities, including newspaper advertising and personal calls on customers. The Government does not claim that these activities are in any way related to its cause of action.

In *Farmland Industries v. Seaboard Coastline Railroad Company*, 490 F.Supp. 438 (W.D.Mo.1980), the court found that the defendant was not "doing business" in Missouri under § 506.150, where the only activities that defendant carried out through its Missouri office were the solicitation of business and the servicing of ac-

counts. In the instant case, the United States fails to point to any additional activities of Syntex Laboratories sufficient to satisfy the general service statute.

The United States does not contend that Syntex Corporation is currently doing business in Missouri. Rather, the Government contends that Syntex Corporation controls Syntex Agribusiness, which is doing business in Missouri. That argument was rejected above. This Court recognizes the corporate separateness of Syntex Corporation and refuses to exercise jurisdiction over it under the general service statute.

**II. NATIONWIDE SERVICE OF PROCESS UNDER CERCLA**

Rule 4(f) allows service of process beyond the territorial limits of the state in which the federal court sits when a federal statute authorizes such service. The issue presented for decision is whether CERCLA authorizes service of process beyond the territorial limits of Missouri.

The inquiry begins with the language of CERCLA, specifically two sections pertaining to jurisdiction. Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), grants district courts "exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy." This provision pertains to subject matter jurisdiction. *Violet v. Picillo*, 613 F.Supp. 1563 (D.R.I.1985). Section 113(b) also specifies that venue "shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office." Section 106, 42 U.S.C. § 9606(a), authorizes the Attorney General to bring an abatement under appropriate circumstances. Also, Section 106 addresses jurisdiction and provides in pertinent part as follows:

When the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a haz-

ardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require.

The United States concedes that CERCLA does not provide for nationwide service expressly; rather it argues that the above-cited portion of Section 106 provides for nationwide service implicitly.

The doctrine of implicit authorization of nationwide service of process is firmly established in federal case law. *E.g.*, *United States v. Congress Construction Company*, 222 U.S. 199, 32 S.Ct. 44, 56 L.Ed. 163 (1911); *First National Bank of Canton v. Williams*, 252 U.S. 504, 40 S.Ct. 372, 64 L.Ed. 690 (1920); *Federal Trade Commission v. Jim Walter Corp.*, 651 F.2d 251 (5th Cir.1981); *Federal Trade Commission v. Browning*, 435 F.2d 96 (D.C.Cir.1970); *Davis v. Flemming*, 23 F.R.D. 139 (W.D. Mo.1959). The Supreme Court first recognized an implicit provision for nationwide service in *United States v. Congress Construction Company*. In that case, the United States brought suit against the principal and sureties on a bond given pursuant to federal statute for the construction of a public building. The action was brought in the district where the defendants resided, not the district where the contract was to be performed, though the authorizing statute restricted such actions to the latter forum. The Supreme Court affirmed the trial court's dismissal for lack of personal jurisdiction. The Court rejected reasoning that if suit could be brought only where the contract was to be performed, a defendant who resided elsewhere and had no other connection with the forum could never be sued:

> [T]he provision restricting the place of suit operates *pro tanto* to displace the provision upon that subject in the general jurisdictional act [citation to contemporary statute omitted] and amply authorizes the circuit court in the district wherein the action is required to be brought to obtain jurisdiction of the persons of the defendants through the service upon them of its process in whatever district they may be found.

222 U.S. at 203–04, 32 S.Ct. at 46. In *Congress Construction* and in other cases finding implied nationwide service, courts implied such service to effectuate federal statutory causes of action when the statute itself limited venue. Recently, one court summarized this rationale as follows:

> [T]he federal statutes [which implied nationwide service of process] laid venue in only one district, such that a failure to imply authority for extraterritorial process would deprive any federal court of the power to adjudicate cases under the statute, absent the fortuitous circumstance that a defendant enjoyed the necessary minimum contacts with the sole district in which venue was proper.

*Violet v. Picillo*, 613 F.Supp. 1563 (D.R.I. 1985).

This Court finds that Section 106 implies nationwide service of process. That section designates the district court of the district in which the environmental threat occurs as the appropriate forum to adjudicate an abatement action and specifically grants jurisdiction to that district court. Since the statute authorizes no other court to dispose of abatement actions, Section 106 so limits the place of suit of the United States as to require an implied grant of authority for extraterritorial service of process to effectuate enforcement.

Defendants contend that Section 113 supplements Section 106. By laying venue in the district in which the release occurred or in which the defendants reside, defendants argue, Section 113 relaxes the restriction of Section 106 and obviates the need for extraterritorial process. Defendants' interpretation of Section 113(b) renders the specific jurisdictional grant of Section 106 superfluous. Their interpretation, therefore, offends a cardinal rule of statutory construction—namely, all parts of a statute, if at all possible, are to be given effect. *Wein-*

*berger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1972); *Ginsberg & Sons, Inc. v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704 (1932). Moreover, specific terms prevail over the general within the same statute. 285 U.S. at 208. Thus, to effectuate the specific jurisdictional grants of Section 106, this Court reads the language of that section as displacing the general venue provisions of Section 113 with regard to abatement actions.

Defendants also note that the Toxic Substances Control Act (TSCA), 15 U.S.C. § 2619 (1982), expressly provides for nationwide service of process. From this fact, defendants reason that the absence of an express provision for nationwide service in CERCLA constitutes a congressional rejection of nationwide service. Though reference to similar statutes may aid in statutory interpretation, this Court does not find the express provision of nationwide service under TSCA and the absence of such provision under CERCLA dispositive of the issue at hand. Defendants ignore the possibility that nationwide service may be implied under one statute and not another. Further, defendants cite no legislative history to support its equation of silence with rejection of nationwide service. Indeed, an examination of the purposes of CERCLA and its legislative history confirms the decision of this Court.

In interpreting a statute, a court will not look merely to a particular clause, but will take in connection with it the whole statute and the objects and policy of the law. *Brown v. Duchesne,* 19 How. 183, 194, 60 U.S. 183, 194, 15 L.Ed. 595, (1857). Acting in response to several hazardous waste disasters and perceived inadequacies in existing law, Congress enacted CERCLA as a remedial statute. *See,* Note, *Generator Liability Under Superfund For Clean-Up Of Abandoned Hazardous Waste Dump Sites,* 130 U.Pa.L.Rev. 1229, 1230–31 (1982). Clearly, Congress drafted CERC-

LA to initiate and establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned and inactive hazardous waste sites. H.R.Rep.No. 96–1016, Part I, 96th Cong., 2d Sess., at 21 (reprinted in 1980 U.S. Cod. Cong. & Ad. News 6119, 6125). Generally, CERCLA was designed to overcome delays resulting from prolix litigation and to expedite clean-up of hazardous waste sites. *See,* 130 U.Pa.L. Rev. at 1231. Section 106 constitutes an important provision in this regulatory scheme. Section 106 differs from the general clean-up provisions of Sections 104 and 107. Congress intended Section 106 as an emergency provision for use in the face of an imminent hazard when the normal cost-recovery mechanisms might prove too time consuming and cumbersome. *United States v. Northeastern Pharmaceutical Chemical Company,* 579 F.Supp. 823 (W.D.Mo.1984).[3] Section 106 grants broad equitable powers to deal with actual and threatened harm. In light of these purposes, it would be odd for Congress to permit defendants to escape the equitable remedies of a court through the assertion of personal jurisdiction defenses. Moreover, Congress surely recognized that equitable remedies imposed by district courts would often deal with real property and public health in a particular state. Thus, Congress specified the district court in which the threat occurs as the appropriate forum for abatement actions. Without this designation, only the court where the defendants are found, which might be quite distant, could order remedial action pertaining to the property. Congress could reasonably conclude that such orders would be better left to the discretion of the court sitting in the state where the orders have their greatest effect.

The decision of this Court to imply nationwide service of process for abatement actions does not conflict with the decisions

---

**3.** This Court reserves the issue whether Section 106 functions *solely* as an emergency provision. *See generally,* Frank and Atkeson, *Superfund: Litigation and Cleanup,* 16 Environment Report-

er 29 (BNA Special Report 1985) (citing F. Anderson, *Negotiation and Informal Agency Action* (Administrative Conference of the United States 1984) ).

of other courts examining nationwide service of process under CERCLA. Both *Wehner v. Syntex Agribusiness*, 618 F.Supp. 37 (E.D.Mo.1985) (Filippine, J.), and *Missouri v. Independent Petro Chemical*, 610 F.Supp. 4 No. 83–2670 (E.D.Mo.1985) (Filippine, J.), reject nationwide service of process under CERCLA without discussion. As the summary treatment accorded nationwide service by these decisions indicates, Judge Filippine considered only whether CERCLA provided nationwide service of process *expressly*. Furthermore, these decisions address only whether the cost-recovery sections of CERCLA provide nationwide service of process. Similarly, *Violet v. Picillo*, 613 F.Supp. 1563 (D.R.I. 1985), rejected implied nationwide service of process under the cost-recovery sections of CERCLA, but did not address nationwide service in abatement actions.

This Court must still consider whether the exercise of jurisdiction over the Syntex defendants comports with the requirements of due process. The Fifth Amendment requires minimum contacts between the defendant and the sovereign that has created the court. *Stafford v. Briggs*, 444 U.S. 527, 554, 100 S.Ct. 774, 789, 63 L.Ed.2d 1 (1980) (Stewart, J., dissenting). In cases involving nationwide service, one asks whether the defendants have sufficient contacts with the United States. *See, F.T.C. v. Jim Walter Corp.*, 651 F.2d 251, 256 (5th Cir.1981); *Fitzsimmons v. Barton*, 589 F.2d 330 (7th Cir.1979). With principal offices in the United States, the Syntex defendants have sufficient contacts with the United States to satisfy the requirements of due process.

Although this Court finds nationwide service of process for abatement actions, this Court does not find nationwide service for cost-recovery actions. Personal jurisdiction must be valid as to each and every cause of action in a complaint. *S.L. Kaye Company, Inc. v. Dulces Anahuac, S.A.*, 524 F.Supp. 17 (S.D.N.Y.1981); *R.F.D. Group Ltd. v. Rubber Fabricators, Inc.*, 323 F.Supp. 521 (S.D.N.Y.1971) (construing the New York long-arm statute). Those causes of action which do not provide a sufficient basis for personal jurisdiction must be dismissed even if other claims have such a basis. 524 F.Supp. at 20.

The practice of splitting the causes of action has been criticized as inconsistent with the federal rule philosophy of judicial economy. 4 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1069 n. 82 (1985 Suppl.) (criticizing *R.F.D. Group Ltd.*, 323 F.Supp. 521). One may infer from this criticism that where possible a court should construe long-arm statutes to permit related causes of action to be tried jointly. Here, however, fragmentation of the case results not from a niggardly construction of a long-arm statute, but derives from the jurisdictional scheme established by Congress within CERCLA.

Congress set out the general venue jurisdiction provisions of CERCLA in Section 113(b). That section does not alter traditional restraints upon the exercise of jurisdiction over the person. Thus, in cost-recovery actions, the district court must have personal jurisdiction and proper service of process in accordance with Fed.R.Civ.P. 4. By placing jurisdiction in the district court where the threat occurs, Section 106 provides an exception to the general jurisdictional scheme in Section 113. If this Court took jurisdiction over the abatement and cost-recovery actions, that exception would swallow the whole. In any CERCLA cost-recovery action, the United States could append an abatement claim and, then, use the jurisdictional provision of Section 106 to hale the defendants into court on both actions. In effect, this strategy eliminates the need for the general jurisdiction and venue provisions of Section 113. Just as this Court will not render the language of Section 106 superfluous by ignoring its grant of jurisdiction, this Court will not ignore the traditional restrictions upon jurisdiction implied by Section 113. Congress chose different procedural mechanisms for cost-recovery and abatement causes of action. This judgment outweighs considerations of convenience and judicial economy.

To summarize, this Court will exercise jurisdiction over Syntex Corporation, Syntex Laboratories, and Syntex (U.S.A.) for the abatement action. Regarding the other causes of action, this Court will exercise jurisdiction over Syntex (U.S.A.) but not Syntex Corporation and Syntex Laboratories.